```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF RHODE ISLAND
_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
                                   )
      v.                           )
                                   )  Cr. No. 18-030 WES
                                   )
ADEMOLA KAYODE, JR.,               )
                                   )
            Defendant.             )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

Before the Court is Defendant Ademola Kayode Jr.'s Motion to Suppress Statements, ECF No. 47, and First Motion in Limine to Preclude Introduction of Prior Bad Acts, ECF No. 48. For the reasons set forth below, the Motions are DENIED.

I.   Background[1]

On July 28, 2016, at 9:55 a.m., two agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") knocked on the door of a residential home located at 37 Vickery Street in Warwick,

---

[1] These facts are largely drawn from the transcript of the recorded conversation that took place between Kayode and two ATF agents on July 28, 2016. See Mot. to Supp. Ex. 1, Kayode Transcript ("Tr."), ECF No. 47-2.

Rhode Island.[2]  Tr. 2:1-6.  A woman answered.[3]  Id. 2:7-9.  The agents identified themselves and requested to enter the residence to speak with Kayode.  Id. 2:10-15.  When he appeared, the agents again identified themselves and asked him where they could speak together.  Id. 3:3-10.  Settling into the kitchen, the agents told Kayode that he was not under arrest and that, if he chose to talk with them, he did so "freely and voluntarily."  Id. 3:17-21.

The agents proceeded to question Kayode about sixteen suspicious handgun acquisitions in Georgia and Rhode Island.[4]  Mem. in Supp. of Def.'s Mot. to Supp. Statements ("Def.'s Mem.") 1-2, ECF No. 47-1; United States' Resp. in Opp'n to Def.'s Mot. to Supp. ("Gov't Opp'n") 2-3, ECF No. 53.  In particular, the agents sought to determine the whereabouts of the firearms, repeatedly indicating their belief that Kayode was a "straw purchaser" who had bought the weapons in his name and then either sold them to

---

[2]  They were accompanied by officers of the Warwick Police Department, but the record does not indicate their number or involvement.  See Def.'s Mem. 1.

[3]  According to the Government, this woman is Kayode's aunt who, along with her husband (Kayode's uncle), owns the property. See United States' Resp. in Opp'n to Def.'s Mot. to Supp. ("Gov't Opp'n") 4, ECF No. 53.  However, there is some indication from the transcript that the woman was in fact Kayode's cousin.  See Tr. 3:10-16.

[4]  During their discussion with Kayode, the agents referred to twenty firearms, Tr. 101:22-23, 103:2-3, 108:15-20, but both the Government and Defendant put the number at sixteen in their papers.  Def.'s Mem. 1-2; Gov't Opp'n 1, 3.

others or traded them to others in exchange for drugs.[5] Gov't Opp'n 3-4; Tr. 79:21-80:7, 113:2-4.

Over the course of the interview, the agents accused Kayode of lying and advised him that he could be charged for such false statements. Tr. 13:1-5, 14:17-18, 15:4-14. They asked Kayode whether he believed in God, id. 19:3-6, urging him to let the "Lord be [his] savior," id. 63:10, and declaring that any deaths caused by the handguns would weigh on Kayode's "conscience and soul," id. at 103:20-23. On multiple occasions, they suggested the prospect of obtaining a "benefit" through cooperation, see, e.g., id. at 93:14-21, 95:9-12, although they made clear that they could not promise reduced charges, id. 97:10-12. The agents also implied that failure to cooperate might negatively affect Kayode's family and friends. See id. 104:12-15, 107:18-20. Furthermore, they highlighted the disapproval of Kayode's uncle, id. at 71:23-72:15, and later brought his uncle into the conversation to urge cooperation, id. 97:19. At one point, the agents suggested that Kayode would be "charged and arrested" if he did not "fully cooperat[e]." Id. 34:2-9.

---

[5] For example, one of the agents stated: "You bought [the guns] for someone. They're not yours. I mean, people gave you money for them." Tr. 113:3-4.

For his part, Kayode offered cagey and inconsistent responses,[6] but generally insisted that he had bought the weapons for himself.[7]  Id. 83:5-15, 95:2-8, 102:18-23.  When asked to account for the weapons, he averred that he had either sold them in private sales, id. 102:2-3, or stashed them at one or more undisclosed locations, see, e.g., id. 27:1-28:15, 87:17-88:11.  Additionally, he repeatedly asked for an opportunity to try to retrieve the weapons, which the agents denied, fearing that he would alert their current possessors.  Id. 54:1-11.

Kayode also regularly referred to counsel.[8]  Id. 19:11, 20:4-5, 57:16, 72:20-21, 84:20-21, 104:1, 105:2-3.  Generally, the agents informed Kayode that he could speak to a lawyer, or reminded him that he was speaking to them voluntarily.  See id. 20:6-8 ("You can, you can talk to a lawyer.  Like I said, you're talking to us freely and voluntarily."); id. 57:19 ("You don't have to talk to

---

[6] A characteristic example of Kayode's evasive and confusing answers: "If I go to a certain place, you says it's me, so I promise you my line and I can't get nothing back, I'm gonna tell you all where I had them at.  And then who I, who I left it for. I didn't get for, I got it for myself."  Tr. 93:9-13.

[7] However, Kayode occasionally hinted at operating at the behest of, or working in association with, some other individual or individuals.  See, e.g., id. 68:8-69:5.

[8] The first invocation of counsel occurred early in the conversation, Tr. 19:11, although arguably the first unequivocal invocation occurred much later, id. 72:20-21.  However, the question of equivocality only matters if Kayode was in custody, which he was not.  See infra.

4

us."); id. 84:22-85:4; id. 104:1-7. On at least one occasion, the agents did not acknowledge Kayode's request for counsel. See id. 72:20-73:9. But, at points, the agents appeared to suggest that Kayode could either cooperate and speak with them, or contact a lawyer. See id. 85:3-6, 104:5-7. Eventually, after it became obvious that Kayode would not talk further, and after he clearly indicated his wish to speak with a lawyer, the agents drew the interview to a close.[9] See id. 105:2-114:9. They left without arresting Kayode. Def.'s Mem. 9.

Kayode was arrested nearly two years later, on March 16, 2018, and indicted on five counts: (1) engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D); (2) possession of a firearm by an unlawful user of a controlled substance in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2); (3) false statement during purchase of firearms in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2); (4) false statements to federal agents in violation of 18 U.S.C. § 1001(a)(2); and (5) false statements to federal agents in violation of 18 U.S.C. § 1000(a)(2). Second Superseding Indict. 2-6, ECF No. 38.

---

[9] After concluding the conversation, the agents asked Kayode if they could inspect his bedroom. Def.'s Mem. 9. Kayode consented. Id. The agents executed a search and turned up an empty clip. Id.

On December 30, 2019, Kayode filed the current motion to suppress and motion in limine. See Mot. to Suppress, ECF No. 47.

## II. Discussion

The Court is presented with two issues. First, whether the agents violated Kayode's rights under the Fifth and Fourteenth Amendments by questioning him after he invoked counsel, so that his subsequent statements should be suppressed. Second, whether statements related to Kayode's alleged sale or conveyance of handguns to individuals in Providence engaged in unlawful activity should be precluded under Federal Rules of Evidence 403 and 404(b). The Court deals with each in turn.

### A. Motion to Suppress

Kayode contends that the agents were obliged to quit their questioning when he invoked his right to counsel. Def.'s Mem. 9-10; see Edwards v. Arizona, 451 U.S. 477 (1981); Miranda v. Arizona, 384 U.S. 436 (1966). Since the agents failed to do so, Kayode maintains, any subsequent statements must be suppressed. Def.'s Mem. 10. To support this notion, Kayode marshals the following facts: (1) the agents did not explicitly ask whether he wanted to speak with them; (2) the agents "dominat[ed] the conversation, rarely waiting for answer"; (3) the agents raised the specter of divine judgment to induce cooperation; (4) the agents warned that someone might "get hurt" if he was not forthcoming; (5) the agents claimed he would "get charged and

6

arrested" if he did not "fully cooperate"; (6) the agents warned that failure to cooperate might mean adverse legal consequences for his friends and family; and (7) the agents spoke with him for over an hour, even after he requested an attorney on multiple occasions. See id. at 2-3, 5, 7, 9.

The Government contends, quite simply, that Kayode was not subject to custodial interrogation, and therefore Miranda and Edwards are not implicated, and the agents were free to question Kayode even after he invoked counsel. Gov't Opp'n 5-6. The Government argues Kayode was not arrested that day and that there was no physical limitation of liberty "akin to formal arrest." Id. at 6. The Government further relies on the following facts to support its position that the interview was noncustodial: (1) Kayode was not handcuffed; (2) questioning lasted for roughly an hour; (3) Kayode never explicitly asked the agents to leave; (4) the agents did not yell and the tone was civil; (5) the conversation transpired in the "comfortable environs of his kitchen"; and (6) Kayode was repeatedly informed that he was not under arrest and was not required to speak with the agents. See id. at 4-5, 7-8.

Before beginning a custodial interrogation, law enforcement must inform a suspect of his or her rights to silence and counsel under the Fifth and Fourteenth Amendments. Miranda, 384 U.S. at 468-73. If the suspect expresses an unequivocal desire to consult

with counsel, law enforcement questioning must cease immediately. Id. at 473-74; Edwards, 451 U.S. at 484-85.

However, Miranda and its progeny apply only where an individual is actually in custody, understood as a substantial curtailment of liberty. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Therefore, the chief question before the Court is whether Kayode was in custody during his conversation with the ATF agents on July 28, 2016.

When it comes to determining custody, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citation omitted). Absent formal arrest, the court must perform a two-step review: first, it must consider the objective circumstances; second, it must ask whether, under such circumstances, a reasonable person would have felt free to end the interaction. United States v. Infante, 701 F.3d 386, 396 (1st Cir. 2012). Relevant factors include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Nishnianidze, 342 F.3d 6, 13 (1st Cir. 2003).

Given that Kayode was not formally arrested on July 28, 2016, the Court must undertake the two-step review.

8

The interview occurred in the kitchen of Kayode's residence[10] during mid-morning hours and lasted about eighty minutes. See Tr. 2:2, 3:17-19, 114:9. At least two members of Kayode's family were in the house, one of whom actually participated in the conversation. See id. 2:12-16, 97:19. These factors weigh against a finding of custody. See United States v. Hughes, 640 F.3d 428, 435-36 (1st Cir. 2011) ("Though questioning in a suspect's dwelling may at times comprise a custodial interrogation . . . such a location generally presents a less intimidating atmosphere than, say, a police station."); id. at 437 (finding no custody where interview lasted ninety minutes); United States v. Monroe, 264 F. Supp. 3d 376, 382-83 (D.R.I. 2017)(ninety-minute interview weighs against finding of custody).

Similarly, the number of agents recommends against a finding of custody. The interview was conducted by two ATF agents (although an unknown number of Warwick police officers were also present). Def.'s Mem. 1; see United States v. Melo, 954 F.3d 334, 340 (1st Cir. 2020) (finding that two armed officers present for questioning weighed against a finding of custody); Infante, 701

---

[10] Although Kayode did not own the home, he considered it his residence. See Tr. 88:13.

F.3d at 397 (finding a suspect not in custody where two, and sometimes four, officers were present).[11]

Additionally, the agents did not handcuff Kayode, and at the outset of the interview, they emphasized the voluntary nature of the interaction. Tr. 3:20-21; see Hughes, 640 F.3d at 436 (holding that it was "significant that no meaningful physical restraint was applied to the defendant"). Moreover, there is no other evidence in the record suggesting that Kayode's physical movements within the residence were further restrained. See U.S. v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007)(finding that the level of physical control weighed heavily toward a finding of custody where defendant was ordered to sit a certain place, he was separated from other members of the household, and he was escorted by agents throughout the house, including to the bathroom).

However, the agents arguably sent Kayode mixed signals about the possibility of his arrest. See Podlaski v. Butterworth, 677 F.2d 8, 9 (1st Cir. 1982) (finding a non-custodial determination supported by the fact that suspect was told he was not under arrest). At the beginning of the interview, the agents specifically told Kayode that he was not under arrest. See Tr.

---

[11] Warwick police officers were also present. Def.'s Mem. 1. However, neither party specifies their number, behavior, and location. Since Defendant, in particular, fails to provide these details, the Court's analysis focuses on the number, behavior, and location of the agents.

3:19-20.  Sometime later, one of the agents again said to Kayode: "I'm not going to arrest you right now."  See Tr. 66:4-5.  But at two other points in the conversation, the agents stated that once his uncooperative behavior was reported to the United States' Attorneys' Office, the agents could be told to arrest him.  See Tr. 42:13-14; 73:1-4 ("[I]f I say you are cooperating, then they're going to say continue on.  If they . . . tell me that you know what, you're done, these guys just gonna basically put the cuffs on you and that's it, you're done.").

Furthermore, the character and tone of the interview was far from "relaxed and non-confrontational".  See Hughes, 640 F.3d at 437.  A review of the audio and reading of the transcript indicate that agents doggedly pressed their case against Kayode, often interrupting and badgering him.  See, e.g., Tr. 64:1-13.  The agents at times evoked religious themes, e.g., id. 19:3-6, 63:10, and emphasized that Kayode's uncle was upset that he had been "put . . . in [this] situation," id. 71:23-72:5. They suggested that lack of cooperation would result in negative legal consequences for Kayode, id. 73:2-4, as well as for his family and friends, id. 37:8-11.  The agents warned that Kayode would be "charged and arrested" if he did not divulge the location of the handguns, id. 34:2-9, and that, on the flipside, he might procure favorable treatment if he did so, id. 93:14-94:3.  True, the agents did not raise their voices during the conversation, but it is clear that

11

the atmosphere became more pressurized as the interview continued. All of these factors are entitled to some weight in this analysis.

Additionally, Kayode seems to have attempted to break off the conversation at various points, only to be cajoled back into talking by the agents. See, e.g., id. 62:2-3 ("I really don't want to talk too much.").[12] Moreover, Kayode referenced or requested an attorney at least seven times. Id. 19:11, 20:4-5, 57:16, 72:20-21, 84:20-21, 104:1, 105:2-3. And more than once, the agents arguably implied that if Kayode ended the interview to talk to a lawyer, he could forfeit the potential benefit of his cooperation. See id. 104:1-105:5; 111:2-4 ("But you, do you want to try to work this out with me or do you want a lawyer?").

While this is a close call, the Court cannot say that the questioning was so relentless as to lead a reasonable person to believe that the agents "would not have heeded a request to depart."[13] See Borodine v. Douzanis, 592 F.2d 1202, 1207-08 (1st Cir. 1979). The agents doubtlessly brought pressure to bear on Kayode, and no small amount of clever and sometimes subtle subterfuge, but "a noncustodial situation is not converted to one

---

[12] Perplexingly, Kayode elsewhere says the precise opposite: "But I do want to talk to you all though." Tr. 57:22.

[13] Indeed, Kayode did successfully assert his intent to speak to a lawyer rather than continue the interview, which ended shortly after he told the agents "I'd rather just get a lawyer." Tr. 105:2.

12

in which <u>Miranda</u> applies simply because . . . even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" <u>Mathiason</u>, 429 U.S. at 495 (citation omitted).

This is clearly a case where Defendant felt pressure and was deeply conflicted about what to do. But the internal conflict he faced was of his own making. He wanted to keep the dialogue going in order to help himself — until he decided to end it. He tried very hard to persuade the agents to do it his way, and they refused. <u>See, e.g.</u>, Tr. 54:1-11. And when he finally realized that he could not persuade them, he stopped the interview. All of this shows that even while the agents were employing numerous good cop/bad cop routines, Kayode was just as much in control as they were.

On balance, the circumstances discernible from the record suggest that Kayode was not in custody, i.e., that he did not suffer a restraint on his freedom akin to formal arrest. Therefore, his statements will not be suppressed.[14]

---

[14] The Supreme Court has acknowledged that "noncustodial interrogation might possibly, in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" <u>Beckwith v. United States</u>, 425 U.S. 341, 347-48 (1976). This allowance apparently affords a basis for suppressing non-custodial statements given a determination that the suspect's will was overborne, although the Court strongly implies that such occasions are rare, since non-custodial encounters almost by definition lack the coercive pressures necessary to undermine voluntariness. Of course, Kayode does not

13

B.   Motion in Limine

Kayode argues that, under Federal Rules of Evidence 404(b), the Government cannot introduce into evidence any statements concerning allegations that he sold drugs, received drugs in consideration for the sale of firearms, or was once arrested for drug possession. Mot. in Lim. 1, ECF No. 48. Without conceding Kayode's argument, the Government has agreed to redact portions of the interview related to those matters. Gov't's Resp. to Def.'s First Mot. in Lim. to Preclude Intro. Of Prior Bad Acts ("Resp. to Mot. in Lim."), ECF No. 52.

Kayode also argues that, under Rules 403 and 404(b), the Government cannot introduce statements concerning allegations that he sold or otherwise supplied weapons to individuals in Providence engaged in illegal activities, which allegations are not supported by any other evidence. Mot. in Lim. 1. The Government contends that Rule 404(b) is inapplicable, since the statements do not concern prior bad acts, but rather the very crimes for which Kayode is charged. Resp. to Mot. in Lim. 1. The Government maintains that such statements are direct evidence tending to show that Kayode knowingly dealt firearms without a license, and that his operation was "focused" on supplying felons unable to acquire weapons for themselves. Id. at 2. The Government also asserts

---

actually pursue a voluntariness argument, but rather rests his case on Miranda and its progeny. Def's. Mem. 9-10.

14

that it intends to produce three handguns bought by Kayode and subsequently sold to drug dealers. Id. There is no mention of Rule 403 in the Government's response.

Rule 404(b) bars the prosecution's use of prior bad acts to establish the defendant's "character or propensity to commit a crime." United States v. Landry, 631 F.3d 597, 601 (1st Cir. 2011). However, "[t]hat prohibition . . . typically refers to evidence that is extrinsic to the crime charged." United States v. Roszkowski, 700 F.3d 50, 56 (1st Cir. 2012). On the other hand, "evidence intrinsic to the crime for which the defendant is on trial, accordingly, is not governed by Rule 404(b)." United States v. Manning, 79 F.3d 212, 218 (1st Cir. 1996). Evidence is intrinsic where it "comprises part and parcel of the core events undergirding the crime for which [the defendant is] charged." Roszkowski, 700 F.3d at 56; see also United States v. Doe, No. 2:11-CR-00136-GZS, 2011 WL 5983034, at *1 (D. Me. Nov. 29, 2011) ("The majority of circuits have held that Rule 404(b) applies only to limits on the admission of other acts extrinsic to the one charged. Under that rule, acts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." (quoting United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996))). Here, Kayode is charged with, inter alia, engaging in the business of dealing in firearms without a license. Therefore, statements related to such alleged sales are certainly "part and

15

parcel of the core events undergirding" the charged crimes. Roszkowski, 700 F.3d at 56.

As for Rule 403, it requires that relevant evidence be excluded where "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Kayode suggests that the statements concerning his alleged illegal handgun sales to criminals in Providence are unfairly prejudicial. Mot. in Lim. 1. "Unfair prejudice . . . is reserved for evidence that invites the jury to render a verdict on an improper emotional basis or for evidence that is shocking or heinous and likely to inflame the jury." United States v. Soto, 799 F.3d 68, 90 (1st Cir. 2015) (internal quotation marks and citation omitted). The statements in question are arguably quite probative. On the other hand, they are hardly likely to disturb, shock, or inflame the jury. The key question is whether these statements have "the capacity . . . to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." United States v. Kilmartin, 944 F.3d 315, 336 (1st Cir. 2019) (quoting Old Chief v. United States, 519 U.S. 172, 180 (1997)). Here, the opposite is likely the case: that is, the statements will tend to direct the jury's gaze toward issues pertinent to the

16

charged offense. The danger of "fanning the flames" of the jurors' passions is slim to none. See id. at 337.

Therefore, the statements related to Kayode's alleged illegal dealing of handguns to individuals in Providence supposedly involved with criminal activities should not be precluded.[15]

III. Conclusion

Based on the foregoing reasons, Defendant Ademola Kayode Jr.'s Motion to Suppress Statements, ECF No. 47, and First Motion in Limine to Preclude Introduction of Prior Bad Acts, ECF No. 48, are DENIED.

IT IS SO ORDERED.

*/s/ WESmith*
William E. Smith
District Judge
Date: September 21, 2020

---

[15] Of course, the Court accepts the parties' agreement to preclude those statements related to Kayode's purported use of drugs and previous arrest on drug charges. See supra pg. 13.

17