**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA** | : |
| | : |
| **VS.** | : |
| | :　　**Cr. No. 1:18-cr-00030-WES-PAS** |
| **ADEMOLA KAYODE, Jr.** | : |
| | : |

**UNITED STATES' TRIAL MEMORANDUM**

The United States of America, by and through its attorneys, Richard B. Myrus, Acting United States Attorney for the District of Rhode Island, and Ronald R. Gendron and Lee H. Vilker, Assistant United States Attorneys, hereby submits an outline of the evidence it intends to introduce during the upcoming trial of the pending indictment as well as a brief discussion of the legal issues it anticipates may arise.

**BACKGROUND**

**I.     The Charged Conduct**

On September 24, 2019, defendant Ademola Kayode, Jr., ("Kayode" or "Defendant") was indicted by a federal grand jury, charging him with offenses relating to the purchase and sale of approximately 16 firearms between March 25, 2015 through July 14, 2016 in the states of Rhode Island and Georgia. Count 1 charges Defendant with engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a) and 924(a)(1)(D); Count 2 charges him with possessing a firearm as an unlawful user of controlled substances, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2); Count 3 charges him with making a false statement during the

1

purchase of firearms in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2); and Counts 4

and 5 charge him with making false statements to federal agents, in violation of 18

U.S.C. §1001(a)(2).

## II.    Elements of Charged Offenses

**COUNT 1**: Engaging in the business of dealing in firearms without a license, in

violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a) and 924(a)(1)(D). To establish a violation of

this statute, the Government must establish the following:

1.    That on or about the dates set forth in the indictment, the defendant

engaged in the business of dealing in firearms,

2.    That the defendant did not have a license as an importer, manufacturer, or

dealer in firearms, and

3.    That the defendant acted willfully.

Section 921(a)(21)(C) defines the phrase "to engage in the business" of, as found

in § 922(a)(1)(A), to mean: as applied to a dealer in firearms, . . . a person who devotes

time, attention, and labor to dealing in firearms as a regular course of trade or business

with the principal objective of livelihood and profit through the repetitive purchase and

resale of firearms, but such term shall not include a person who makes occasional sales,

exchanges, or purchases of firearms for the enhancement of a personal collection or for

a hobby, or who sells all or part of his personal collection of firearms[.]

Section 921(a)(22) defines the phrase "'with the principal objective of livelihood

and profit' to mean that the intent underlying the sale or disposition of firearms is

2

predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, that proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism."(Emphasis in original).

"The plain import of [18 U.S.C. § 921(a)(21)(C)] reflects congressional intent to criminalize the selling of guns as a business—whether as the seller's sole means of income or as the seller's side business—by a person who is not a licensed firearms dealer. It also reveals congressional intent not to criminalize the selling of firearms by an unlicensed dealer who merely seeks to improve or otherwise modify a personal collection or to infrequently sell an odd gun here or there." *United States v. Focia*, 2017 WL 3880733 (11th Cir. Sept. 6, 2017). "But nothing in the amendments or the rest of the statutory language indicates that a person violates § 922(a)(1)(A) only by selling firearms as his primary means of income." *Id.* "The exact percentage of income obtained through the sales is not the test; rather, courts have recognized that the statute focuses on the defendant's motivation in engaging in the sales." *Id.*

In *United States v. Beecham*, 1993 WL 188295 (4th Cir. 1993), the court interpreted these definitions to require the following in order to sustain a conviction:

> The government need not prove that a defendant's primary business was dealing in firearms or that he necessarily made a profit from it (citation omitted). The government must show a willingness to deal, a profit motive, and a greater degree of activity than occasional sales by a hobbyist.

*See also United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) (unpublished)

3

(upholding defendant's conviction of § 922(a)(1)(A) even though he suffered a *net loss* from dealing firearms).

Since there is not a number of firearms or amount of profit required by § 922(a)(1)(A), violations of this statute are fact specific, and are evaluated on a case-by-case basis. Although helpful, a large number of firearms is not required to prove a violation of § 922(a)(1)(A). *See, e.g., United States v. Shan*, 361 F. App'x 182, 183 (2d Cir. 2010) (unpublished) (sufficient evidence where defendant sold two firearms); *United States v. Pineda*, 411 F. App'x 612, 614 (4th Cir. 2011) (same; four firearms); *United States v. Nadirashvili*, 655 F.3d 114, 120 (2d Cir. 2011) (same; eight firearms procured by two defendants).

**COUNT 2**: Possessing a firearm as an unlawful user of controlled substances, namely, marijuana, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). To establish a violation of this statute, the Government must establish the following:

1.      The defendant knowingly possessed a firearm, to wit, those specified in Count 2 of the Indictment, and

2.      At the time of the charged act, the defendant was an unlawful user of a controlled substance, namely, marijuana, and

3.      At the time of the charged act, the defendant knew that he was an unlawful user of a controlled substance, namely, marijuana, and

4.      Possession of the firearm was in or affecting commence, which can be shown through the firearms travel in interstate commerce, including

4

manufacture outside Rhode Island.

Note on Element No. 3: After *Rehaif v. United States*, 139 S. Ct. 2191 (June 21, 2019) the government must prove that the defendant "knew he had the relevant status when he possessed" the firearm, 139 S. Ct. at 2194—i.e., "that he knew he belonged to the relevant category of persons barred from possessing a firearm," *Id.* at 2200. This requirement does not require proof that the defendant specifically knew that he was legally prohibited from possessing a firearm because of that status. The government need only prove that the defendant knew, at the time he possessed the firearm, that he had one of the statuses described in Section 922(g). Here, that means that the evidence must demonstrate that defendant knew that he was an unlawful user of a controlled substance, namely, marijuana, at the time he possessed the firearms listed in Count II.

**COUNT 3**: Making a false statement during the purchase of firearms in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). Here, the Indictment alleges that Kayode, when applying to purchase firearms from D&L Shooting Supplies, an FFL, on June 16th and 24th, 2016, knowingly made a material false statement on an ATF Form 4473 designed to deceive the FFL, namely, by specifying that he was not an unlawful user of marijuana when in fact he knew that he was. To establish a violation of 18 U.S.C. § 922(a)(6), the Government must establish the following:

1.    Defendant knowingly made a false oral or written statement to a federally licensed firearms dealer,

2.    The false statement was made in connection with the acquisition or

attempted acquisition of a firearm, and

3.        The statement was intended *or* likely to deceive such firearms dealer with

respect to a fact material to the lawfulness of the sale of the firearm to the

defendant.

**COUNTS 4 & 5**: Making false statements to federal agents, in violation of 18

U.S.C. §1001(a)(2). To establish a violation of this statute, the Government must

establish the following:

1.        Defendant made a statement or representation,

2.        The statement was false or fictitious,

3.        The statement or representation was material (actually influences or has a

natural tendency or capacity to influence a decision or function of a federal

agency),

4.        Defendant acted knowingly and willfully (knowledge that the conduct

was unlawful), and

5.        The statement pertained to a matter within the jurisdiction of the

executive branch of the United States government.

Count 4 relates to a July 28, 2016 interview of Kayode conducted by ATF agents

at Kayode's home during which Kayode falsely stated and asserted that the firearms he

recently purchased in Rhode Island were located in different places in Georgia.

Count 5 relates to a March 25, 2018 post-arrest interview of Kayode conducted by

ATF agents during which Kayode falsely stated and asserted that his firearms had been

stolen, when he did not, in fact, believe that the guns he had previously purchased had been stolen.

### III.      Summary of the Evidence

During the latter part of May 2016, Bureau of Alcohol, Tobacco, and Firearms Special Agent Wing Chau ("Agent Chau") learned Kayode bought multiple firearms in multiple sales transactions from firearms retailers located in Georgia and Rhode Island. The first multi-firearm purchase was conducted on March 25, 2015 at Arrowhead Pawn Shop in Jonesboro, GA, 30236 in which he purchased a Keltec PF-9 .9mm pistol and Taurus PT740 Slim .40 cal. pistol. Kayode used a GA Driver's License to purchase the firearms. The second multi-firearm purchase was conducted on May 5, 2016 at D&L Shooting Supplies located in Warwick, RI, in which two Taurus PT111 .9mm pistols were purchased.   Kayode used a RI Identification Card, number XXX5142, during those purchases.   That card lists his address as 37 Vickery Street, Warwick, RI, which he used as his current residence on the firearm transaction paperwork.   The third multi-firearm purchase was also conducted at D&L Shooting Supplies on May 23, 2016 in which, again, two Taurus PT111 .9mm pistols were purchased.

ATF Special Agent Christian Jardin ("Agent Jardin") thought it suspicious that someone would want four of the same make and model handgun, especially since the Taurus handguns are inexpensive and have no value as collectibles.

On June 16, 2016, Agent Jardin learned from personnel at D&L Shooting Supplies

7

that approximately two weeks prior to June 16, 2016, the gun store called Kayode and asked him to return to the store to complete some missing information on his paperwork.   Kayode told store personnel that he wouldn't be able to come in for a while, but finally did return to the store on June 16, 2016, which Agents noted as odd since Kayode reported that he resides in the town in which the gun store is located. On June 16, 2016, Kayode visited D&L Shooting Supplies to complete the missing information.   While there, Kayode selected a .40 caliber handgun and paid a fifty-dollar deposit for the firearm. Kayode filled out the applicable firearm transaction paperwork, listing his current residence as 37 Vickery Street, Warwick, RI.   Kayode was informed that this handgun would be ready for acquisition by Kayode on Friday, June 24, 2016.

Agents learned that Kayode uses phone number (678) 508-7646 in conjunction with the firearm transactions. Kayode lists this number on the gun store receipts and the gun store personnel called and spoke with Kayode at this number.

On Friday June 24, 2016 at approximately 3:10 p.m., Agents were notified by Mike Syslo of D&L Shooting Supplies that Kayode was at that store gun store. Agents Jardin and Chau responded to D&L Shooting Supplies located at 3314 West Shore Road Warwick, RI.   At approximately 3:30 p.m., Agents established a surveillance position across the street from the gun store. The Agents observed a white Mazda bearing MA Registration 2FJ989 parked in the gun store parking lot near the front door and observed a person sitting in the driver's seat of the vehicle and a person sitting in the front passenger's seat of the vehicle.   Agents observed the man in the front passenger

8

seat of the Mazda leave the vehicle and enter the gun store. This male exited a short time later and reentered the front passenger seat of the vehicle and was observed by Agents using a cell phone.

At about 4:00pm, Agents observed Kayode exit the gun store carrying at least two packages. One of the packages appeared to be a black gun box.   Kayode entered the rear seat of the Mazda behind the driver with the packages and, a short time later, the vehicle left the parking lot.   Agents began surveillance of the vehicle as it drove away from the gun store.   The vehicle took a right turn onto West Shore Road and continued straight until bearing left onto Sandy Lane. The vehicle continued on Sandy Lane until it took a left turn onto Warwick Avenue. Agents Jardin and Chau noted that this was the route to 37 Vickery Street in Warwick, the address that Kayode listed on his firearm transaction paperwork.   Agents Jardin and Chau followed the vehicle on Warwick Avenue and observed as the vehicle traveled past Vickery Street without stopping.   Agents found it suspicious that Kayode did not immediately bring the firearms to his residence after acquiring them. Agents Jardin and Chau followed the vehicle as it continued on Warwick Avenue which turned into Broad Street. The vehicle traveled on Broad Street and made a left turn onto Potters Ave. Agents noted that the three men had traveled into a high crime area of Providence, RI.   The vehicle took a right turn onto Elmwood Ave and a left turn onto Westfield Street. The vehicle then made a right turn onto Harrison Street and a left turn onto Cranston Street. Agents lost sight of the vehicle at this point.

9

Agents traveled back to D&L Shooting Supplies and learned that Kayode acquired four handguns from the gun store before leaving.   Agent Jardin obtained a copy of the firearm transaction paperwork and noted that Kayode purchased the following four handguns: Smith &Wesson .40 caliber pistol SN HEC4986; Smith &Wesson 9mm pistol SN RAW3837; Taurus .40 caliber pistol SN SIV49734; and Taurus 9mm pistol SN TJP23371.   Agent Jardin noted that Kayode purchased another Taurus model PT-111 9mm pistol. Agent Jardin noted that this was suspicious because Kayode now had purchased at least five of the very same make and model firearm since May of 2016. The Taurus PT-111 9mm firearm is an inexpensive handgun with little to no value as a collectible.

Agents learned that Kayode uses phone number (678) 508-7646 in conjunction with the firearm transactions. Kayode lists this number on the gun store receipts and the gun store personnel called and spoke with Kayode at this number.

After speaking with store employees, Agent Jardin contacted an ATF Industry Operations Investigator assigned to the ATF Atlanta Field Division to determine how many firearms Kayode purchased from Arrowhead Pawn Shop located in Jonesboro, GA and learned that Kayode had purchased five firearms at that store between 03/25/15 and 04/18/15.

Cell site data and call records of Kayode's phone were obtained pursuant to court order. Examining it, Agents determined that Kayode left Providence the morning of July 3, 2016 and arrived near the Charlotte, NC airport around 10:00am.   Kayode

arrived in the Atlanta, GA area around noon that same day. Based on location data relating to Kayode's cell phone they determined that Kayode was most likely staying at the address listed on his GA Driver's License (5398 Spellman Drive Atlanta, GA 30331). Examination of his cellphone records showed that on July 3, 2016 Kayode made a call to a number listed in an online "Armslist" firearms marketplace advertisement for a .40 handgun.

On July 15, 2016, Agent Jardin learned that Kayode was identified as purchasing at least one firearm on July 14, 2016.   He obtained the ATF F 4473 showed Kayode purchased 3 firearms from FFL Team 88 Enterprises, 1145 Grace Street, Mableton, GA: an Extar model EXP 556 .223 caliber pistol, Serial No. EP05608; Taurus model PT111 .9mm pistol, Serial No. TJN 83934; and a Taurus model PT111 .9mm pistol, Serial No. TJN 83854.

Based on electronic data from Kayode's phone, Agents noted that on July 18, 2016 Kayode left the state of GA and was travelling north back to Rhode Island, suggesting possible mode of transportation by train, bus, or automobile.

Agent Jardin noted that, in all, Kayode had purchased at least 16 handguns since March of 2015, and also noted that at least six of them were Taurus PT-111 9mm handguns:[1]

| | FIREARM MAKE/MODEL | BUY DATE | FFL |
|---|---|---|---|
| 1. | KELTEC, PF-9, 9mm pistol, S3598 | 03/25/2015 | Arrowhead Pawn |
| 2. | Taurus, PT740, .40 pistol, SGX95752 | 03/25/2015 | Arrowhead Pawn |
| 3. | **Taurus, 24/7, .40 pistol, SFN37521** | **04/02/2015** | **Arrowhead Pawn** |

---

[1] Firearms in bold font were later recovered by law enforcement from persons prohibited from possessing or purchasing firearms under federal law.

| | | | |
|---|---|---|---|
| 4. | SCCY, CPX-1, 9mm pistol, 018348 | 04/08/2015 | Arrowhead Pawn |
| 5. | Taurus, PT111, 9mm pistol, THZ01304 | 04/18/2015 | Arrowhead Pawn |
| 6. | Taurus, PT111, 9mm pistol, TJO54891 | 05/05/2016 | D&L Shooting Sup. |
| 7. | **Taurus, PT111, 9mm pistol, TJO54070** | **05/05/2016** | **D&L Shooting Sup.** |
| 8. | Taurus, PT111, 9mm pistol, TJP77432 | 05/23/2016 | D&L Shooting Sup. |
| 9. | **Taurus, PT111, 9mm pistol, TJP23722** | **05/23/2016** | **D&L Shooting Sup.** |
| 10. | S&W, SW40VE, .40 pistol, HEC4986 | 06/24/2016 | D&L Shooting Sup. |
| 11. | **S&W, SW9VE, 9mm pistol, RAW3837** | **06/24/2016** | **D&L Shooting Sup.** |
| 12. | Taurus, PT140, .40 pistol, SIU49734 | 06/24/2016 | D&L Shooting Sup. |
| 13. | **Taurus, PT111, 9mm pistol, TJP23371** | **06/24/2016** | **D&L Shooting Sup.** |
| 14. | EXTAR, EXP556, .223 pistol, EA05608 | 07/16/2016 | Team 88 Enterprises |
| 15. | Taurus, PT111, 9mm pistol, TJN83934 | 07/16/2016 | Team 88 Enterprises |
| 16. | Taurus, PT111, 9mm pistol, TJN83854 | 07/16/2016 | Team 88 Enterprises |

This obviously was of concern to ATF since repeated purchases of inexpensive handguns with little to no value as collectibles within a short period could be indicative of a person acting as a "straw purchaser" of firearms for other persons prohibited from possession or, worse, an individual who was trafficking firearms.

On July 28, 2016, Agents Jardin and Chau went to Kayode's address at 37 Vickery Street in Warwick to interview him regarding his acquisition of the handguns and to determine the current location of those 16 guns. Agent Jardin activated a covert recording device shortly before Agents arrived at 37 Vickery Street. Upon arriving at the residence, Agent Jardin rang the doorbell and knocked on the front door, which was answered by a female later identified as Kayode's aunt, the owner of the home. Agents Jardin and Chau identified themselves as Federal Agents and asked to speak with Kayode, and his aunt summoned him.

Moments later, Kayode appeared. Agent Jardin identified himself to Kayode as an ATF Agent and showed Kayode his badge and credentials. Although formal *Miranda*

12

warnings were not given to Kayode because he was not in custody, Agent Jardin informed Kayode that he was not under arrest and that if he chose to speak with Agents, he would be doing so freely and voluntarily. Thereafter, the Agents spoke with Kayode for approximately one hour. Kayode was not placed in handcuffs during the interview, nor was his liberty otherwise restrained. The interview occurred in the kitchen of the home. Although Kayode referenced consulting with an attorney at various points during the interview, he continued to speak with Agents. At no time did Kayode stop answering questions posited by the Agents or ask that the Agents stop questioning him and leave his home.

During the interview, Kayode informed the Agents that he had been buying firearms, and the handguns that he purchased in RI were not at 37 Vickery Street Warwick, RI. He said he brought the guns that he purchased in RI to GA by bus and indicated that he was planning on moving back to Atlanta, GA. He said he flew to GA on July 3, 2016 on American Airlines and returned to RI by bus, taking the "Megabus" from NY to RI.

Kayode then said he brought the guns that he purchased in RI by bus to GA last week. Kayode brought the guns to an address in GA that he described as "Riverdale," his cousin's at 5398 Spellman Drive Atlanta, GA 30331. Kayode brought all of the guns to GA and they are in "different places" in GA. Kayode described the different places as his cousin's house and his little brother's house.   Kayode used the guns in a music video he recorded in Atlanta, GA. The guns that Kayode bought in GA are still in GA

13

and they are at "different places" in GA.   Kayode could not account for how many guns were in GA. Kayode is planning on bringing the guns back up to RI.

Kayode later stated that he sold some of the guns that he bought in RI in private sales on Armslist using his Gmail account.   Kayode stated that he took the guns to GA and sold them to people that he met through Armslist.   Kayode also bought guns while he was in GA and sold them. Kayode stated that he had not sold any guns to anyone in RI.   Kayode does not have a license to carry firearms.

Kayode was told that Agents followed him after he purchased guns at a gun store in RI and was seen driving past 37 Vickery Street and into south Providence. Kayode then said that he left guns at his friend's house. Agent Jardin and Agent Chau observed two other men in the car with Kayode when he acquired handguns from the gun store.   Kayode stated that he did not know the names of the other two men that were in the car with him.

Kayode stated that he did not get paid for purchasing guns and he used his own money to buy the guns.   Kayode said he saved his money to buy the guns.   Kayode did not work at the time he was interviewed and could not remember the last time he did work.   Kayode previously worked at CVS through a program that he used to get his GED.

Kayode was asked about drug use and admitted he smokes "weed" – marijuana – and stated that he has been smoking weed "every now and then" since high school. On all of the ATF Form 4473s that Kayode completed when applying to purchase each

14

of the firearms at issue in this matter, Kayode has answered "No" to the question of whether he was an "unlawful user" or marijuana or other controlled substance.

Kayode stated that the last three handguns that he purchased in GA were still in GA. The guns that Kayode bought in RI are in "different places" and he doesn't know where they are. Some of the guns were kept at Francois Parker's house on California Ave. in Providence, RI.   Kayode stated that he did not buy the guns for Francois PARKER or LJ Clinton.   Kayode would keep the guns at different places. Kayode did bring guns to 37 Vickery Street Warwick, RI.   Kayode considers this to be his residence. Kayode also brought guns to different places because he stays at different people's houses.   Kayode ultimately would not tell Agent Jardin the location of the guns because he was not sure if the guns were still there.

Kayode stated that he sold the three guns that he bought in GA in private sales before he came back to RI.   Kayode said that he made $1,500.00 on the sale of those firearms.   Kayode initially wouldn't tell agents where in RI he brought the guns, or the names of any people associated with the guns. Kayode was buying guns in RI and he was planning on driving them to Atlanta to sell them in private sales.   Kayode acknowledged that this did not happen.   Kayode said he bought the guns and kept them "somewhere."

Following the interview, agents again asked Kayode if any guns were present at 37 Vickery St., and he indicated there were none there.   Agents asked Kayode if they could take a look at his room to make sure that there were no guns in his room.

15

Kayode agreed and informed them that he had an ammunition clip on the dresser in his room. Before any search commenced, Agent Jardin presented Kayode with an ATF Consent to Search Form that Agent Jardin read to Kayode and then asked Kayode if he understood the form, to which Kayode answered in the affirmative by shaking his head up and down. Agent Jardin then asked Kayode if agents could search his room and he said "Yeah."[2]   Kayode informed Agents that he had one room in the residence and signed the form. Kayode then showed Agents his room.

Agents then conducted a search of the room and took photographs of evidence seized from the room. Agent Jardin also took a post-search video of the room. The following items were seized from the bedroom:

- 9mm ammunition magazine - given to Agent Chau by Kayode from the top of the bedroom dresser
- 36 rounds of 9mm ammunition
- Apple iBook G4 located on a nightstand next to the bed (plugged in)
- Apple iPhone 6 cell phone
- LG Model LGMS345 cell phone
- Alcatel one touch cell phone
- American Airlines baggage tag dated 07/03 in the name of Ademola Kayode
- D&L Shooting Supplies receipt in the name of Ademola Kayode
- RAW rolling papers located inside of a coat pocket that was hanging on the bedroom closet door
- Two Georgia driver's licenses in the name of Ademola Kayode
- Pawtucket Credit Union Visa debit card and Texas Trust Master Card debit card in the name of Ademola Kayode and a Pawtucket Credit Union letter addressed to him at 37 Vickery
- South Grand Prairie High School ID and Bright Point Fort Worth ID card in the name of Ademola Kayode
- RI High School Equivalency Diploma in the name of Ademola Kayode

---

2  Agent Jardin also asked Kayode for consent to search the addresses in Georgia that Kayode mentioned during the interview and Kayode said "no." Agent Jardin also asked Kayode to take him to the last known location of the firearms and Kayode said "no."

- State of Rhode Island Department of Human Services letter addressed to Ademola Kayode (37 Vickery) – located by Agent Jardin on top of the bedroom dresser
- Resume, birth certificate, and (2) Social Security Cards of Ademola Kayode
- Sprint account paperwork bearing Kayode's name and a Verizon letter addressed to Ademola Kayode at 37 Vickery Street

Before leaving, Kayode told Agents that the cell phones were his and that the iPhone is the cell phone that he currently uses, and the black (LG) cell phone was the cell phone that he was using prior to the iPhone. Search warrants were later obtained to search the seized cell phones.

Two days later, on July 30, 2016, Kayode went to the Warwick Police Department and filed a firearm-theft complaint. Officers Greene and Marano met with Kayode in the lobby of the police station where Kayode provided the officers with a written statement. He claimed that he transferred 10-12 firearms to his shed at 37 Vickery about a week ago. Kayode stated that "yesterday" - July 29, 2016, the day after speaking with ATF agents at his home - he was going to clean his guns that he had recently moved into a safe in a shed that is attached to the back of his house at 37 Vickery Street in Warwick and noticed that his safe containing 10-12 guns was missing.   Kayode stated that he had moved the guns into this shed from his bedroom about a week before. Kayode also stated that a leaf blower and a leaf trimmer were missing from the shed and identified the items as a Black and Decker leaf blower (valued at $150.00) and a Black & Decker leaf trimmer (valued at $150.00).

Kayode stated that the safe contained 10-12 guns, all of which were handguns.

17

Kayode stated that the stolen guns included Smith & Wesson and Taurus guns. Kayode stated that they were a mix of .40 caliber and 9mm handguns.   Kayode stated that some were compacts and some were full size.   Kayode stated that he purchased some of the guns in June and some of the guns in July.   Kayode stated that he did not know the exact dates on which he had purchased the guns; however, he knew that he bought all ten to twelve guns at D&L Shooting Supplies located in Warwick, RI.

Kayode advised that the door to the shed had been pried open and he believed that was how the shed was broken into.   Kayode stated that he had not told anyone or any of his friends where the guns were because he just moved them a week ago. Kayode stated that he did not know anyone who possibly could have stolen his guns.

Warwick officers reported to 37 Vickery St. to investigate the theft.   Officer Marano observed that the door did not have any damage or pry marks matching Kayode's description. Kayode opened the shed door with a key and the officers entered the shed. Kayode led the officers to the back side and stated that the guns were in the left-hand side of the shed. Detective Sergeant Sullivan took a series of digital photos of the scene. They photographed the shed and the shed door.

Kayode provided a receipt for some of the guns, which was taken as evidence. On one occasion (June 24, 2016), Kayode purchased three guns valued at $674.00. The guns were a Smith & Wesson SD9VE (valued at $239.99), a Taurus PT140 G2 .40 caliber (valued at $189.99), a Taurus PT111 9mm (valued at $199.99).   Kayode advised that he would contact D&L Shooting Supplies to retrieve the receipts from the other guns

18

purchased so the officer could enter the guns as stolen.

After search warrants were obtained, ATF enlisted the assistance of Providence Police Detective Theodore Michael to extract the data from the cellphones taken from Kayode's bedroom. Det. Michael is highly trained in, inter alia, computer forensics and cell phone data extractions and since 2011 has served as his department's Mobile Forensic Examiner. Items of evidentiary value were found on the iPhone and LG, but none on the Alcatel. As set forth in the language of the indictment, the analysis revealed numerous text messages between Kayode and others relating to the purchase and sale of firearms and the purchase and usage of marijuana. A 6/28/16 text from Kayode to an apparent marijuana dealer complains that a bag of marijuana he recently purchased "is as skinny as shit" and is accompanied by a picture of a hand holding a bag of what appears to be marijuana. A video is also found on Kayode's phone showing apparent marijuana on a bedspread, matching the one that agents observed in Kayode's bedroom.

Kayode was arrested on March 25, 2018 and taken to the Warwick Police Department for processing. There, in a recorded post-arrest interview, Mr. Kayode told the ATF agents, for the first time, that the guns he purchased had been stolen, consistent with his July 30, 2016 firearm-theft complaint to the Warwick Police, but contrary to what he first told ATF Agents on July 28, 2016.

During the investigation, Agents learned that certain firearms that had been purchased by Kayode had been recovered by law enforcement agencies in several states

during criminal investigations or arrests. The parties will stipulate that:

On June 23, 2016, members of the Providence Police Department seized a firearm at 17 Hanover Street, 2nd Floor, Providence, Rhode Island, the residence of Quincy Dejesus ("Dejesus"). The firearm seized by the Providence Police Department was a Taurus model PT111 9 mm pistol, serial number TJO54070. Dejesus was a person prohibited from possessing a firearm under federal law on June 23, 2016.

On August 16, 2016, the Atlanta Police Department seized a firearm from the person of Darrian Dupree ("Dupree"). The firearm seized by the Atlanta Police Department was a Taurus .40 caliber pistol, serial number SFN37521.   Dupree was a person prohibited from possessing a firearm under federal law on August 16, 2016.

 On October 11, 2019, members of the New York City Police Department seized a firearm at 14-35 Dalian Court, Queens, New York, the residence of Emmanuel Polanco ("Polanco"). The firearm seized by the New York City Police Department was a Taurus PT111 9 mm handgun, serial number TJP23722. Polanco was a person prohibited from possessing a firearm under federal law on October 11, 2019.

On February 28, 2020, members of the Rhode Island State Police seized a firearm at 44 Rounds Ave., Providence, RI, the residence of Jonathan Rodriguez ("Rodriguez"). The firearm seized by the Rhode Island State Police was a Taurus model PT-111 9mm pistol, serial number TJP23371. Rodriguez was a person prohibited from possessing a firearm under federal law on February 28, 2020.

On August 17, 2021, members of the Federal Bureau of Investigation ("FBI")

seized a firearm at 116 Lenox Avenue, 3rd Floor, Providence, Rhode Island, the

residence of Giancarlo Fermin ("Fermin"). The firearm seized by the FBI was a Smith &

Wesson 9 mm pistol, Model Number SW9VE, serial number RAW3837. Fermin was a

person prohibited from possessing a firearm under federal law on August 17, 2021.

In each of these recoveries, the Government has no evidence of how the arrestees

acquired these firearms or whether they obtained them directly from Kayode.

The parties will also stipulate to the fact that the firearms listed in Count 2 of

Indictment were manufactured outside of Rhode Island and had been shipped or

transported to Rhode Island in interstate or foreign commerce.


## IV. Legal Issues

### A. <u>Defendant's Statements</u>

Three statements made by Kayode to law enforcement will be used at trial.

Kayode made his first oral statement to law enforcement on July 28, 2016 at his home at

37 Vickery Street in Warwick. There, while not under arrest, he spoke to ATF agents for

approximately one hour and the interview – unbeknownst to Kayode – was recorded

by the ATF agents. This statement was the subject of both a Motion to Suppress and

Motion in Limine previously filed by the defense. The court declined to suppress the

statement or to strike from it, pursuant to Rule 404(b), certain remarks made by Kayode

"related to Kayode's alleged illegal dealing of handguns to individuals in Providence

supposedly involved with criminal activities." *ECF* No. 62. Per discussions between the

parties, however, only certain portions of Kayode's lengthy first statement will be used at trial, with much extraneous or irrelevant material redacted or omitted.

On July 30, 2016, two days after his ATF interview, Kayode filed a police report at the Warwick Police Department indicating that 10-12 handguns that, a week earlier, he had put in a safe in his shed had been stolen from that location. As part of that complaint, Kayode completed a hand-written statement for police describing the theft that will be introduced at trial, in addition to testimony of the Warwick Police officer that took the complaint and investigated the shed.

Kayode's second and considerably more abbreviated oral statement to law enforcement was made at the Warwick Police Department following his arrest on March 25, 2018. The statement was audio taped and recorded on video. That statement, in which he stated to ATF Agents for the first time that his firearms had been stolen, was given in a custodial setting following administration and waiver of Kayode's *Miranda* rights. The government will only seek to move into evidence the initial portion of this statement before defendant mentioned speaking with an attorney.

### B. Expert Testimony

**Special Agent Mattheu Kelsch, ATF:** If necessary, the government intends to call S/A Mattheu Kelsch regarding the firearms listed in Count II of the Indictment. As indicated in his CV previously furnished to the defense, S/A Kelsch has received extensive training by the Bureau of Alcohol, Tobacco, Firearms and Explosives and has been certified to determine the place of manufacture of firearms to establish interstate

22

nexus.   S/A Kelsch will testify that he reviewed the firearms received by Kayode from D&L Shooting on June 24, 2016 listed in Count 2 of Indictment, namely, a Smith & Wesson SW40VE .40 caliber semi-automatic pistol (serial number HEC4986); a Smith & Wesson SW9VE 9mm semi-automatic pistol (serial number RAW3837); a Taurus PT140 G2 .40 caliber semi-automatic pistol (serial number SIU49734); and a Taurus PT111 9mm semi-automatic pistol (serial number TJP23371), and will testify the referenced firearms are indeed firearms as defined in Title 18 U.S.C. Chapter 44 § 921(a)(3) and were manufactured outside the state of Rhode Island, and had been shipped or transported to Rhode Island in interstate or foreign commerce.

### C. Lay Opinion Testimony

**Special Agent Christopher Jardin, ATF**:   Based upon his training and experience, S/A Jardin is expected to testify about the meaning of certain terms found in the text messages on defendant's phone pertaining to marijuana and firearms. For example, S/A Jardin will testify that Kayode refers to marijuana as "gas" in text messages relating to marijuana, and to firearms as "compact tools" or "hammers" in text messages relating to firearms.   Courts, including the First Circuit, have long held that government witnesses with experience in particular investigations may explain coded language for juries, either through lay or, if qualified, expert testimony. *See, e.g., United States v. Rosado–Pérez*, 605 F.3d 48, 56 (1st Cir. 2010)(government witnesses with experience in drug investigations may explain the drug trade and translate coded

language for juries, either through lay or, if qualified, expert testimony); *United States v. Santiago*, 560 F.3d 62, 66 (1st Cir. 2009) (officer as lay witness testified to code words or phrases used by the defendants, primarily to designate drug quantities); *United States v. Maher*, 454 F.3d 13, 23-24 (1st Cir. 2006) (upholding the admission of agent testimony regarding the meaning of words and numbers used in 'Post-It' notes seized from the defendant's vehicle, and testimony regarding the typical packaging of narcotics); *United States v. Villarman-Oviedo*, 325 F.3d 1, 13 (1st Cir. 2003) (agent allowed to testify to meaning of code words); *United States v. Rivera-Rosario*, 300 F.3d 1, 17 (1st Cir. 2002) (coded drug phrases). S/A Jardin has more than 20 years' experience with ATF investigating firearms and narcotics cases. During that time, he has interviewed or spoken to numerous defendants, cooperators, and witnesses regarding the meaning of "slang" terms used to refer to narcotics or firearms, in live conversations or those captured by audio or video recording, text message, or posted on social media. Additionally, as someone intimately involved with the investigation of Mr. Kayode, S/A Jardin is well-suited to contextualize the meaning of certain terms or text conversations for the finder of fact.

**<u>Detective Theodore Michael, Providence Police Department</u>**: The government also intends to call Det. Michael to testify concerning the data extraction he performed on Kayode's cell phones using Cellebrite and comparable mobile forensic data-extraction tools. Since 2010, Det. Michael has been assigned to the Major Crimes Unit of

Providence Police Department's Investigative Bureau and, since September 2017, has

served as a Task Force Officer, United States Secret Service - Department of Homeland

Security, with the New England Electronic Crimes Task Force. Consistent with his CV

previously furnished to the defense, Det. Michael is highly trained in, inter alia,

computer forensics and cell phone data extractions. Since 2011, Det. Michael has served

as his department's Mobile Forensic Examiner and, from 2015 to present, has been

qualified as an expert 14 times in both state and federal courts in Rhode Island with

respect to testimony relating to Mobile Forensics Examination, Digital Forensic

Examination, Cellular Sites, and Location Data. Det. Michael will testify that S/A Jardin

contacted him and requested assistance in extracting data from an Apple iPhone 6 cell

phone, model MG6A2, IMEI: 352024079783522 (Exhibit 35), a LG cell phone, model

LGMS345, IMEI: 356592-07-427226-7, SIN 512CYXM427226 (Exhibit 36), and an Alcatel

Model 7040N, IMEI: 014188008071224. These phones had been seized by ATF during an

investigation relating to Ademola Kayode. Det. Michael used the Cellebrite Universal

Forensic Extraction Device (UFED) to extract data successfully from the iPhone and LG

cell phones, no data of evidentiary value was found on the Alcatel. Data extracted from

the iPhone and LG included, among other things, call logs, emails, subscriber

information, text messages and chats, images, and videos. Reports in .pdf format were

created of the extractions, in addition to searchable databases using Cellebrite Reader,

and all were previously furnished to the defense.[3]  Text messages, images, and videos from this data extraction will be introduced into evidence.

While Det. Michael has been qualified as an expert repeatedly in the field of mobile forensics, courts differ on whether expert qualification is actually needed for similarly situated police officers to recount the use and results of cellphone data extractions performed using Cellebrite and similar mobile forensic tools.[4]  Indeed, many courts, including the First Circuit in 2020, have deemed such testimony to be lay testimony and admissible without expert qualification.

For example, in *United States v. Chavez-Lopez*, 767 Fed.Appx. 431 (4th Cir. April 11, 2019), defendant, appealing his conviction on narcotics offenses, contended that the trial court erred in allowing a Homeland Security intern, Yerry, to give "expert opinion testimony…about the extraction of the cellphone data [which] necessarily involved an opinion about the accuracy of Cellebrite, which he says only an expert could offer." *Id.* at 433. The court first stated that '[a]ll witnesses may testify to facts within their

---

3  While certain text messages and images found on defendant's phone will be introduced into evidence as paper copies, the entirety of the iPhone and LG extractions will not be produced on paper as physical exhibits since the two reports combined exceed 10,000 pages in length. Rather, the two reports have been consolidated and burned onto a DVD that will be authenticated by Det. Michael and introduced into evidence as Exhibit 46.

4  A 2017 amendment to F.R.E. 902 actually obviates the need for testimonial evidence in such instances and allows for the introduction of records generated by an electronic process, like Cellebrite extraction reports, to be admitted by way of certification. That provision provides:

> (13) Certified Records Generated by an Electronic Process or System. A record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12). The proponent must also meet the notice requirements of Rule 902(11).

personal knowledge. But for opinion testimony, the Federal Rules distinguish between reasoning familiar in everyday life and reasoning that requires expertise." (citation omitted). *Id.* at 434. The court went on to note "[e]xperts may thus offer opinions based on 'scientific, technical, or other specialized knowledge.' *Fed. R. Evid. 702.* Lay witnesses, in contrast, may only offer opinions that are 'rationally based on [their] perception,' helpful to the jury, and not based on specialized knowledge. *Fed. R. Evid. 701.* So, a lay witness may testify that a substance looks like blood but not that certain bruises indicate head trauma." 767 Fed.Appx. at 434 (citation omitted).

Based on this reasoning, the court concluded that Yerry's testimony was that of a lay witness, not an expert, and needn't have been qualified as such to render his testimony:

> Under this standard, Yerry did not give expert testimony. First, Yerry did not offer an opinion. His brief testimony concerned the actions he took to extract the data—hooking the phones up to a computer, following a few prompts, and saving data onto an external drive. Yerry's role as a witness is, therefore, best characterized as testifying about facts in his personal knowledge.
> Second, to the extent Yerry offered an opinion, it was lay testimony. Chavez-Lopez contends that Yerry implicitly vouched for Cellebrite's accuracy in extracting data. But Yerry offered no assurances about how well Cellebrite performed. At most, he offered the opinion that Cellebrite copies data from a cellphone, which he derived from his personal experience using the software. That testimony requires no more specialized knowledge than other opinions we have considered lay testimony, such as police officers' testimony that a substance they observed was methamphetamine, that a shorthand statement made to them carried a certain meaning, or that an observed use of force was objectively reasonable. (citations omitted). Yerry's testimony didn't require a technical understanding of Cellebrite, and he made no claims about the program's effectiveness or reliability. He only testified about copying data from one drive to another, which is "the product of reasoning processes familiar to the average person in everyday life."(citation omitted); *see also In re D.H.*, No. A140779, 2015 WL 514336, at *6 (Cal. Ct. App. Feb. 6, 2015) (holding that an officer gave only lay

testimony about the extraction of data using Cellebrite because "[t]he idea that images may be downloaded from a cell phone is familiar to the general population")."   767 Fed.Appx. at 434.

The First Circuit recently adopted the same reasoning in allowing officer's lay testimony concerning the use of cellphone data-extraction software and introduction of the resultant "extraction reports." *United States v. Montijo-Maysonet*, 974 F.3d 34 (1st Cir. 2020). Other courts are in accord. *See United States v. Ovies*, 783 F. App'x 704, 707 (9th Cir. 2019) ("The district court did not abuse its discretion by allowing [the witness] to testify about using Cellebrite to extract data from [the defendant's] cell phone without first qualifying him as an expert witness...."); *United States v. McLeod*, 755 Fed.Appx. 670, 672–75 (9th Cir. 2019); *United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017); *United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) ("[The witness] did not purport to render an opinion based on the application of specialized knowledge to a particular set of facts" when he "testified to the contents of the messages [he] retrieved from [a] phone."); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1133 (M.D. Fla. 2007) ("[The witness] is permitted to testify regarding the data obtained from such computers, the dates of the elimination of material from such computers, if based on fact and not opinion, and the procedures used to extract such information. Expert opinion testimony by this witness, however, will not be permitted.")

## D.    Certified Domestic Records of Regularly Conducted Activity

28

The government will introduce a number of business records pursuant to the certificate of the custodian of records. Fed. R. Evid. 803(6)(A)-(D), Records of a Regularly Conducted Activity, provides in pertinent part:

> "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness…[a] record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by-or from information transmitted by-someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all of these conditions are shown by the testimony of the custodian or another qualified witness, **or by certification that complies with Rule 902(11)…**"

Fed. R. Evid. 803(6) (emphasis added)

Fed. R. Evid. 902(11) provides for the admission of business records if accompanied by a written declaration of a custodian of records certifying that the records were (1) made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (2) was kept in the course of the regularly conducted activity; and (3) was made by the regularly conducted activity as a regular practice.   See Fed. R. Evid. 902(11).   To admit business records pursuant to a certificate, the party seeking admission must provide written notice in advance of trial to the adverse party to provide the party with an opportunity to challenge the authenticity of the records.   See id.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars the admission of "testimonial statements of witnesses absent

29

from trial." 541 U.S. at 59.   Two years later in *Davis v. Washington*, 547 U.S. 813 (2006)

the Court held that Crawford's prohibition "applies only to testimonial hearsay." 547

U.S. at 823-824.

"The Supreme Court has yet to supply a comprehensive definition of

testimonial." *U.S. v. Cameron*, 699 F.3d 621, 639 (1st Cir.2012). Certain types of

statements by their nature (however) are not testimonial - for example business records.

*Id.* Relying on *Crawford*, the First Circuit has held in a number of cases that business

records are admissible absent confrontation. *Id.* (citations omitted). "Documents kept in

the regular course of business may ordinarily be admitted at trial despite their hearsay

status, except 'if the regularly conducted business activity is the production of evidence

for use at trial.'" *Id.* at 640 (citation omitted).

"To rank as 'testimonial,' a statement must have a 'primary purpose' of

'establishing or proving past events potentially relevant to later criminal prosecution'".

*Id.* None of the business records the Government seeks to introduce were created by

the entities to prove events relevant to this criminal prosecution. Indeed, all of these

records are records created by the entities to carry out their "core business purpose"

and are completely unrelated to any litigation related function.

Also, courts have held that the admission of business records pursuant to the

written declaration of the records custodian was proper because a certificate of

authenticity is non-testimonial for purposes of the Sixth Amendment. *See United*

*States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) ("[W]e hold that the written certification

entered into evidence pursuant to Rule 902(11) is non-testimonial just as the underlying

business records are."); *see also United States v. Adefehinti*, 510 F.3d 319, 328 (D.C. Cir.

In light of such precedent, the records and the certificates in question meet the

requirements of Fed. R. Evid. 902(11). The following business records along with an

accompanying certificate of the custodian were previously furnished to the defense in

satisfaction of Fed. R. Evid. 902(11):

> Exhibit 31 -   American Airlines Certificate of Business Records – certifies
> accuracy of records provided by Donna Williams, keeper of records for the
> business, and fact that produced records were kept and produced in the normal
> course of business. Record in exhibit is airline record of Ademola Kayode's July
> 3, 2016 flight from Providence to Atlanta.

> Exhibit 102 - Arrowhead Pawn Certificate of Business Records – certifies
> accuracy of records provided by Christie Young, keeper of records for that store,
> and fact that they were kept and produced in the normal course of business.
> Records that were produced with this certificate are found in Exhibits 1-14
> relating to following firearm purchases/dates by Kayode from Arrowhead:

| | | |
|---|---|---|
| KELTEC, PF-9, 9mm pistol, S3598 | 03/25/2015 | Arrowhead Pawn |
| Taurus, PT740, .40 pistol, SGX95752 | 03/25/2015 | Arrowhead Pawn |
| Taurus, 24/7, .40 pistol, SFN37521 | 04/02/2015 | Arrowhead Pawn |
| SCCY, CPX-1, 9mm pistol, 018348 | 04/08/2015 | Arrowhead Pawn |
| Taurus, PT111, 9mm pistol, THZ01304 | 04/18/2015 | Arrowhead Pawn |

## E. Public Records

Public records are admissible as an exception to the hearsay rule under F.R.E.

803(8), which provides as follows:

> **Public Records.** A record or statement of a public office if:
> (A) it sets out:
>       (i) the office's activities;

31

> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Further, F.R.E. 902 provides that public records are admissible as self-authenticating in two ways:

> **(1) Domestic public documents that are sealed and signed.** A document that bears:
>> (A) a seal purporting to be that of the United States; any state, district, commonwealth, territory, or insular possession of the United States; the former Panama Canal Zone; the Trust Territory of the Pacific Islands; a political subdivision of any of these entities; or a department, agency, or officer of any entity named above; and
>> (B) a signature purporting to be an execution or attestation.
>
> **(2) Domestic public documents that are not sealed but are signed and certified.** A document that bears no seal if:
>> (A) it bears the signature of an officer or employee of an entity named in Rule 902(1)(A); and
>> (B) another public officer who has a seal and official duties within that same entity certifies under seal (or its equivalent) that the signer has the official capacity and that the signature is genuine.

The public records that the United States seeks to introduce would be admissible under either of these provisions: each record bears the agency's official seal in addition to an attestation by a person with knowledge that the signature of the person certifying the public record is in fact who that person purports to be and the signature is genuine. The United States will introduce the following records under these provisions:

> Exhibit 93 – Declaration by Marla L. Mason, Assistant Chief, Federal Firearms Licensing Center, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice Martinsburg, West Virginia, certifying that

she knows Kimberley Rowland to be Supervisor, Federal Firearms Licensing
Center, ATF, Martinsburg, West Virginia, and has legal custody of ATF records
pertaining to firearms licenses for all persons who make application for or are
issued such licenses within the State of Rhode Island to engage in business as
firearms dealers and the affixed signature is the genuine signature of said
Kimberley Rowland.

  Also, certification by Kimberly Rowland that D&L Shooting Supplies Inc,
3314 West Shore Road, Warwick, Rhode Island was licensed as a Dealer In
Firearms Other Than Destructive Devices, during the period of April 1, 2016
through July 1, 2016.

  The official seal of the governmental agency is affixed to the certifications.


Exhibit 100 - Declaration by Benjamin Scoll, Chief, Law Enforcement Support
Branch, ATF, United States Department of Justice Martinsburg, West Virginia,
certifying that he knows Kevin Anderson have legal custody of ATF records
relating to Multiple Sales Reports documentation and the affixed signature is the
genuine signature of said Kevin Anderson.

  Also, certification by Kevin Anderson that the attached pages are true
copies of a Multiple Sale Summary and an ATF Form 3310.4, Report of Multiple
Sale or Other Disposition of Pistols and Revolvers, received from Team 88
Enterprises, FFL 1-58-10472, pertaining to the transfer of an Extar 5.56/.223
mm/caliber pistol, model EXP556, serial number EA05608 and the transfer of
two Taurus 9mm pistols, both model PT111, serial numbers TJN83934 and
TJN83854 from Team 88 Enterprises to Ademola Babatunde Kayode on July 16,
2016.

  Kevin Anderson also included a Certification of Business Records
certifying that the attached documents are public records maintained by the ATF
and that they set out a matter observed while under a legal duty to report.

  The official seal of the governmental agency is affixed to the certifications.


## F. Absence of Public Record

Similarly, the federal rules of evidence also allow, as an exception to the hearsay

rule, the introduction of the *absence* of a public record to show that an event did not

occur, or something does not exist in the public record. FRE 803(10) provides as follows:

Absence of a Public Record. Testimony — or a certification under Rule 902 —
that a diligent search failed to disclose a public record or statement if:

(A) the testimony or certification is admitted to prove that

    (i) the record or statement does not exist; or

    (ii) a matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind; and

(B) in a criminal case, a prosecutor who intends to offer a certification provides written notice of that intent at least 14 days before trial, and the defendant does not object in writing within 7 days of receiving the notice — unless the court sets a different time for the notice or the objection.

Pursuant to this provision, the United States will introduce a public record from ATF showing that, during the timeframe relevant to the indictment, Kayode was not licensed to be a firearms dealer by ATF nor had he ever applied to ATF for such a license:

Exhibit 45 - Declaration by Tracey L. Robertson, Chief, Federal Firearms Licensing Center, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice Martinsburg, West Virginia, certifying that she knows Kimberley Rowland to be Supervisor, Federal Firearms Licensing Center, ATF, Martinsburg, West Virginia, who has legal custody of ATF records for the 50 states pertaining to firearms licenses for all persons who make application for or are issued such licenses in any State to engage in business as firearms importers, manufacturers, dealers, or collectors and the affixed signature is the genuine signature of said Kimberley Rowland.
    Also, certification by Kimberley Rowland that she made a diligent search of ATF records and that no record or entry was found therein with respect to the application for or issuance of a firearms license to Ademola Kayode, Jr. at any address in the 50 States of the United States and its Territories for the period of January 1, 2015 through September 6, 2019.
    The official seal of the governmental agency is affixed to the certifications.

## V.    Requested Voir Dire and Jury Instructions

The Government has previously filed its proposed Voir Dire questions and will file its jury instructions under separate cover.

## VI.     Exhibit and Witness List

The Government will file its witness and exhibit lists consistent with the Court's

pretrial Order.

## VII.     Estimated Time of Trial

The government estimates that it will take two to three days to conduct the trial.

Respectfully submitted,

RICHARD B. MYRUS
Acting United States Attorney

/s/ Ronald R. Gendron
RONALD R. GENDRON
Assistant U.S. Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Ronald.Gendron@usdoj.gov
Tel: 401-709-5036

/s/ Lee H. Vilker
LEE H. VILKER
Assistant U.S. Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Lee.Vilker@usdoj.gov
(401) 709-5044

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October 2021, I caused this document to be
filed electronically and that it is available for viewing and downloading from the ECF
system by counsel for the defendant.

/s/ Ronald R. Gendron
RONALD R. GENDRON
Assistant United States Attorney

35